IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 12, 2002 Session

## STATE OF TENNESSEE v. BRIAN LEIDERMAN

**Direct Appeal from the Circuit Court for Grundy County**
**No. 3561      Buddy Perry, Judge**

_____

### No. M2001-01590-CCA-R3-CD - Filed March 26, 2002

_____

The defendant was convicted in January 2001 of aggravated assault and sentenced to four years in community corrections. Subsequently, while confined in the Grundy County Jail, he was charged with assaulting another inmate, which generated a probation revocation warrant. Following a hearing, the court revoked the community corrections sentence and ordered that he serve the sentence imposed for his aggravated assault conviction. He appealed the revocation, arguing that the evidence was insufficient to justify it and that his due process rights were violated because the trial court did not provide in its revocation order a written statement as to the evidence relied upon. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

Philip A. Condra, District Public Defender, and David O. McGovern, Assistant District Public Defender, for the appellant, Brian Leiderman.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; James Michael Taylor, District Attorney General; and Steven H. Strain, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Brian Leiderman, was convicted of aggravated assault on January 25, 2001, sentenced to four years, and placed into community corrections. He was arrested on March 6, 2001, after the issuance of a probation revocation warrant alleging that he had again committed aggravated assault, and confined in the Grundy County Jail. He was arrested again on June 4, 2001, following the issuance of a second probation revocation warrant, charging that he had committed aggravated assault on May 26, 2001, while confined in jail. A hearing was held on the second warrant on June 11, 2001, after which the court revoked his community corrections sentence and ordered that he be

confined for the sentence imposed for the January 25, 2001, aggravated assault conviction. In his appeal, he presents the single claim that the trial court erred in revoking his community corrections sentence based upon insufficient proof and in not providing a written statement of the evidence relied upon. We affirm the revocation.

Grundy County Sheriff Robert Meeks testified that when he arrived at the jail on May 26, 2001, he was informed of the incident between the defendant and the victim. He observed that the victim, James Stevens, had a "bruised face, facial lacerations, bruises." Two photographs of the victim were identified by the sheriff, who had taken them. They are exhibits in the appellate record and appear to show that the victim had a laceration and bruising on the outside of his right eye.

The State's second and final witness was the victim, James Stevens, who testified that he had been arrested on May 26, 2001, for public drunkenness and confined at the Grundy County Jail. He testified as to the assault:

> Basically I was stooped down between the medium and maximum security and I received several licks to the back of the head, side of the head. I didn't see who hit me there on the side of the head. I was trying to get back to my feet and I received a kick in the ribs and I saw that [the defendant] kicked me in the ribs and said, "When you see Shannon remember that," and that's all I remember, trying to get back to the front of the door.

The victim explained that "Shannon is a girl that I dated and [the defendant] also dated." He said that the kick, which "cracked" two of his ribs, was delivered ten to twenty seconds after he had been struck in the head. He described his injuries as "my ear drum was swollen up. My jaw was fractured, and two ribs were fractured, and a black eye, and a small concussion to the head." The victim said that the defendant kicked him, but he did not see the defendant strike him with his fists. The victim said that as the incident was occurring, all of the other inmates were around.

During cross-examination, the victim said that some of the blows to his head were struck by a "black arm." He admitted that he had four felony convictions.

The defendant's first witness was Robert Lee Canada, who, after the victim was pointed out to him in the courtroom and before confessing that it was he who had "whooped"[1] the victim, confessed to a jail assault which, apparently, predated the instant matter:

> A    What that day, I heard a man say, Don't slam the door no more, so I stepped out of my cell. When I stepped out of my cell I seen a guy by the name of, I call him RC, I don't know his real name, I seen

---

[1]We presume that "whooped" is synonymous with "whipped."

RC slammed the dude head up against the wall. When he slammed the guy's head up against the wall, I seen the guy slide down. Blood started running out his nose.

Q Okay. Are you thinking, sir, of Mr. Rackler? Is this another incident? We're talking about the one just within the last few weeks.

A Oh, the one I whooped?

Q Yes, sir.

A Show him to me. I just whooped one just about two weeks ago.

Q Okay. Could you explain to the Court what happened that day?

A What happened that day?

Q Yes. This is the recent one.

The witness then confessed to the assault on the victim:

A Oh, okay, you talking about on a Saturday. They brought this man drunk. He's sloppy drunk. Acted like he crazy. I don't know who he is. He walks up to my cell and say, "Hey, big black 'un."

I said, "Man, who you talking?" I'm lay there listening to my radio. I said, "Man, who you talking?"

He said, "I'm talking to you." He drunk.

I said, "Man, go on out about my cell." I don't know who he is. I said, "Man, step back up by my cell."

About that time my brother, Lee Canada, walks up. He said, "Man, what's going on here?"

I said, "Nothing." I said, "Man, get out of my cell." He walks out of my cell, walking down the hall. I said, "Man, who you talking to?"

He said, "I'm talking to you." That's when I hit him and knocked him down. When I hit him and knocked him down I was stomping him. I stomped him all the way to the back, in the drunk tank, where

-3-

we use the bathroom at. Stomped him all the way out and 15 minutes later after the police come back there and get him, they come get Brian Leiderman right there and get him a warrant saying Brian Leiderman whooped him. I told the police I whooped him.

Q   Did Mr. Leiderman have any involvement in that scuffle that day at all?

A   The only thing, he was brushing his teeth, the only thing he told me, said, "Man, leave him alone. Let him go." Because I was fixing to hurt him bad.

Q   Mr. Leiderman told, Mr. Leiderman's the one that made those statements?

A   Yeah, he said, "Let him go. Leave him alone."

When asked on cross-examination if he had several felony convictions, Canada said that he had "more than several . . . [a]bout 15 or 20" in fact. He testified that he had been jailed with the defendant for "[e]ight months and something exactly."

Mr. Canada then concluded his testimony with a query to the trial court:

A   Can I ask you something, Judge?

THE COURT:  What?

A   What is the big issue about a man that got whooped over there at that jail? I seen men get whooped in that jail and that ain't no man got no aggravated assault about it. I done whooped two or three in that jail and they ain't nobody give me no aggravated assault. What's so big a deal about that?

THE COURT:  Not yet.

The defendant's next witness was Escbira Lee Canada, the brother of Robert Lee Canada, who said, as he described the incident, that the defendant had no involvement:

A   Well, Brian was in the day room where I was playing dominos and he called my brother the N-word and beat his ass.

Q   Okay. You and Brian were doing what? I didn't understand. You and Brian were what now?

-4-

A   He was in the day room brushing his teeth and we's playing dominos. They was back there fighting. We was the ones that stopped them.

Q   Okay. Stopped what now?

A   Stopped my brother from hitting him.

Q   Okay. Was Mr. Leiderman that day involved in any fashion, did you observe him in any way strike Mr. Stevens?

A   No, he didn't hit him at all.

Q   Did you hit him?

A   No, I didn't hit him.

Q   And when you say you tried to stop it, what did y'all specifically do to try to stop it?

A   Pulled my brother back.

Q   And what was Mr. Leiderman's involvement in that?

A   He was just standing back, told them to stop it.

Q   Who did he tell that to?

A   He told Danny Wayne to stop them from fighting.

On cross-examination, he admitted that he had several felony convictions.

Danny Wayne Anderson, also an inmate at the Grundy County Jail, testified that, as he first observed the incident, "[the victim] and Bug [Robert Lee Canada] was fighting." He said that the defendant's only involvement was when he told Robert Lee Canada to "quit hitting on" the victim.

The defendant's next witness was William Campbell, another inmate at the Grundy County Jail. He said that he was talking on the telephone as the "scuffle" was going on and that the defendant could not have been involved because he saw the defendant "up front away from where" it was happening.

Ricky Dykes, another Grundy County Jail inmate, testified that he was in the "day room" with the defendant when the incident occurred, and that the defendant was not involved. Dykes

agreed upon cross-examination that he had several felony convictions and was still housed in the same cell block with the defendant.

Michael Cash testified that he had been housed in the Grundy County Jail for about two and a half months and had no prior felony convictions. He said that he was in the day room with the defendant as the incident occurred and that "Bug," rather than the defendant, was responsible. Cash said that he had "picked up" the victim and taken him to the door for assistance. He estimated that he would be housed at the Grundy County Jail for another nine or ten months.

James Caldwell, a jailer at the Grundy County Jail, said that he had been on duty when the incident occurred but could not see who was involved. He testified that the victim had accused the defendant and another inmate of the assault just after it had occurred.

The defendant then testified as the final witness, denying that he had injured the victim:

> A   They put Junior back there and I seen him come out there. I was setting on a picnic table. They's playing dominos and spades. I's brushing my teeth. I had an abscessed tooth. I was brushing my teeth. All right. I seen him walk back to the back door, and he walked back up and he stopped in Bug's room, Robert Canada's room. Well, Robert, I don't guess Robert knows him, and I don't know what went on there. He said, Robert asked him, said, "Who are you talking to?"
>
> He said, "I'm talking to you." I just walked, I was standing at the door. Like right here's the gate and here's the day room. I was brushing my teeth, so I backed up off. I knowed what it was going to be to start with. Robert and him, Robert knocked, hit him, started stomping him.
>
> Q   Mr. Leiderman, did you involve yourself in that altercation?
>
> A   No. I told Danny Wayne, I said, "Just quit it." You know what I'm saying?
>
> Q   Danny Wayne?
>
> A   Danny Wayne Anderson was back there and when I went back there I said, That's enough, you know, that he don't need no more.
>
> Q   Who were you telling that to?
>
> A   Robert.

Q   So when you said that what did you mean to say?

A   Don't kill him.  He's a piece of crap.  Don't kill him.  He ain't worth going to the penitentiary over.

Q   Are you running the jail down there?  I mean, are you bossing everybody around and telling everybody –

A   I reckon Robert is.

Q   But have you threatened any of these witnesses today?

A   No.

Q   Have you told them what to say?

A   No.

Q   Did you kick Mr. Stevens that day?

A   No.

During cross-examination, the defendant explained that "Shannon" was his "ex-girlfriend," with whom he had a seven-year-old daughter.  However, they had not had a relationship since he "was about 15."  He estimated that Robert Lee Canada, whom he said was responsible for the assault, was about 6'1", 220 pounds.  The defendant also told of his size and that of the victim, explaining how the facts proved it had not been he who attacked the victim:

>   He's probably 5-6 or 5-4.  Probably weigh about 95 or 115 pounds.  Me, I'm 6-2[.]  I weigh 349, and I don't know think [sic] it takes three black guys and one white man to beat one man up.  I think if I was to stomp him or hit him, I think I would leave permanent damage, you know, would be my guess.  349 pounds come down, I believe it would be a little bit more than a cracked rib, so it's just a made up thing to send me on to the penitentiary.

Following the defendant's testimony, the court made its findings:

>   I got to judge the credibility of the witnesses in this case and make my conclusions about the believability or the lack of believability, and the story I'm suppose to believe is 115 pound guy just had the lack of judgment to stop by and pick on someone that

-7-

obviously considers themself [sic] to be and probably is in old country expressions, a tush hog. That's just not credible.

Now, he got himself whipped. I'm not sure exactly why he got himself whipped. I can't draw the conclusions there, and find him credible when he says that Mr. Leiderman, in fact, did kick him. I don't think Mr. Leiderman's the one that started the whipping and beat him up initially, but I think the proof is sufficient for me to conclude that he joined in it.

. . . .

I find that he's violated the terms of Community Corrections and I revoke him and order the sentence to be served in the Department of Corrections. Draw an order, Counsel.

## I. Sufficiency of the Evidence

The defendant argues that the proof, consisting of one inmate-victim versus six inmate-witnesses and one inmate-defendant, was insufficient. However, for several reasons, we disagree. First, we note that no theory was advanced as to why the 5'6", 115-pound, at best, victim both would deliberately challenge the 6'2", 220-pound Robert Lee Canada, and then perjure himself to convict the defendant. However, it is not difficult to envision why the defense inmate-witnesses would wish to exculpate the 6'2", 349-pound defendant, who had twice been charged, while incarcerated, with assaulting other inmates: following their testimony they would be returning to the cellblock with the defendant which might not be a happy prospect if they testified other than as they did. As for the in-court confession of Robert Lee Canada that it was he, not the defendant, who had assaulted the victim, it appeared that he was not concerned about being prosecuted for assault, as evidenced by the fact that he confessed to two jail assaults. However, his lack of concern as to a future prosecution may have been explained when he responded, "I ain't fixing to discuss nothing about my case in no courtroom," when asked "[a]nd you're currently being held on armed robbery charges and you've got some homicide warrants on you out of Arkansas." Accordingly, we cannot conclude that the trial court erred in determining the proof showed that the defendant had violated the conditions of his community corrections sentence.

## II. Alleged Due Process Violation

The defendant also argues that his "fundamental due process rights were violated because the trial court did not provide in its revocation order any written statement as to the evidence relied upon to revoke him."

As this court observed in State v. Merriweather, 34 S.W.3d 881 (Tenn. Crim. App. 2000):

The legislature of this state has vested in the trial court sole authority to grant suspension of sentences and probation to defendants.  See Tenn. Code Ann. § 40-35-303.  Trial courts are also granted broad authority to revoke a suspended sentence "at any time within the maximum time which was directed and ordered by the court for such suspension, after proceeding as provided in § 40-35-311 . . . ."  Tenn. Code Ann. § 40-35-310.  The procedures outlined in Section 40-35-311 are  fundamental to our system of justice because a defendant who is granted probation has a liberty interest that must be protected by due process.  See State v. Stubblefield, 953 S.W.2d 223, 225 (Tenn. Crim. App. 1997) (citing Practy v. State, 525 S.W.2d 677, 680 (Tenn. Crim. App. 1974)).  The procedures for revocation of probation mandated by our legislature have been determined by  this court to comply with federal constitutional standards as set forth in the leading case of Gagnon v. Scarpelli, 411 U.S. 778, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973).  See Practy, 525 S.W.2d at 682 ("This State's procedure for revocation of sentence suspension and probation is an orderly one affording a probationer full protection of his constitutional right to due process.").

Id. at 884 (footnote omitted).

We have set out previously the oral findings made by the trial court at the conclusion of the hearing.  The probation revocation order states as follows, in pertinent part:

It appearing to the Court that the Defendant was sentenced to 4 yrs, but that the sentences was [sic] suspended and Defendant placed on community corrections on 1-25-01, and it further appearing to the Court that Defendant has violated the terms and conditions of said probation by, new criminal conduct.

It is therefore ordered that the probation aforesaid be, and the same is hereby revoked, and the Defendant is ordered to serve the sentence in the custody of the Dept of Corrections and is given credit for jail service from 1-25-01 until 6-11-01.

The defendant claims that this order does not satisfy the due process requirement of "'a written statement by the factfinders as to the evidence relied on and the reasons for revoking probation or parole.'"  Gagnon v. Scarpelli, 411 U.S. 778, 786, 93 S. Ct. 1756, 1762, 36 L. Ed. 2d 656, 664 (1973) (quoting Morrissey v. Brewer, 408 U.S. 471, 489, 92 S. Ct. 2593, 2604, 33 L. Ed. 2d 484, 499 (1972)).  The reach of this holding was explained in Black v. Romano, 471 U.S. 606, 611-12, 105 S. Ct. 2254, 2258, 85 L. Ed. 2d 636, 643 (1985):

Gagnon concluded that the procedures outlined in Morrissey for parole revocation should also apply to probation proceedings. 411 U.S., at 782. Thus the final revocation of probation must be preceded by a hearing, although the factfinding body need not be composed of judges or lawyers. The probationer is entitled to written notice of the claimed violations of his probation; disclosure of the evidence against him; an opportunity to be heard in person and to present witnesses and documentary evidence; a neutral hearing body; and a written statement by the factfinder as to the evidence relied on and the reasons for revoking probation. Id., at 786. The probationer is also entitled to cross-examine adverse witnesses, unless the hearing body specifically finds good cause for not allowing confrontation. Finally, the probationer has a right to the assistance of counsel in some circumstances. Id., at 790.

However, the fact that none of these opinions explain what form the "written notice" must take has been the source for litigation in various jurisdictions. We note that "[t]he majority of courts that have addressed this issue adopt the view that the transcript may substitute for the written statement if the record includes the evidence relied upon and the reasons for the revocation." Mihal Nahari, Note, *Due Process and Probation Revocation: The Written Statement Requirement*, 56 Fordham L. Rev. 759, 772 (1988). Our review of applicable case law supports this statement. In United States v. Copeland, 20 F.3d 412, 414 (11th Cir. 1994), the court held:

> One of the protections prescribed by Morrissey is "a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." 408 U.S. at 489, 92 S. Ct. at 2604. In this case, the district court did not issue written findings of fact, but instead stated from the bench the evidence it relied upon and the reasons for its conclusion. Appellant contends that the district court's oral statements do not satisfy due process because they are not written. We join our sister circuits in concluding that oral findings, if recorded or transcribed, can satisfy the requirements of Morrissey when those findings create a record sufficiently complete to advise the parties and the reviewing court of the reasons for the revocation of supervised release and the evidence the decision maker relied upon.

Id. (citations omitted).

The rationale of allowing oral findings in a transcript of the hearing to satisfy the "written statement" requirement was explained in State v. Elder, 36 P.3d 172, 174 (Co. Ct. App.), cert. denied, ___ U.S. ___, 2001 Colo. LEXIS 1017 (2001):

The purpose of requiring a "written statement" is to ensure accurate factfinding with respect to any alleged violation and to provide an adequate basis for review to determine if the decision rests on permissible grounds supported by the evidence. Black v. Romano, 471 U.S. 606, 105 S. Ct. 2254, 85 L. Ed. 2d 636 (1985). That purpose is met where, as here, the trial court has made oral findings on the record as to the grounds for the revocation and the basis of the court's decision. See United States v. Daniel, [209 F.3d 1091 (9th Cir. 2000) (amended 216 F.3d 1201)].

The position taken by the large majority of authorities considering this issue is reasonable. We would elevate form over substance if we concluded that the trial court's order revoking community corrections would have been sufficient if it had simply incorporated the oral findings made at the conclusion of proof, but that it was inadequate because it did not. Accordingly, we conclude that where, as here, the transcript demonstrates the trial court provided adequate findings at the conclusion of the probation revocation hearing showing both the grounds for the revocation and reasons for the court's findings, the due process requirement of a "written statement" is satisfied.

## CONCLUSION

Based upon the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE