# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 11, 2015 Session

## STATE OF TENNESSEE v. GLENDALL D. VERNER

**Appeal from the Criminal Court for Davidson County**
**No. 2011-D-3743     Mark J. Fishburn, Judge**

_____

**No. M2014-02339-CCA-R3-CD – Filed May 31, 2016**

_____

The defendant pled guilty on March 21, 2013, to one count of the theft of $1,000 or more, a Class D felony, and one count of the theft of $60,000 or more, a Class B felony. The defendant was given an effective ten-year sentence, all of which was to be served on probation. As part of his probation, the defendant was required to complete two hundred hours of community service work and was forbidden to sell securities or to work in the financial services or insurance business. On April 26, 2014, the defendant's probation officer signed a violation of probation affidavit alleging that the defendant was terminated from his community service program for noncompliance. On May 22, 2014, a second affidavit was issued, averring that the defendant violated the special condition forbidding him from working in the financial services industry when he attempted to solicit investors for a project. The trial court held a hearing on three separate days over the course of four months, and the court ultimately concluded that the defendant had violated the terms of his probation. The trial court revoked the defendant's probation and ordered him to serve one year of his sentence in confinement, to be followed by a new probationary period. The defendant appeals, asserting that his due process rights were violated because the terms of his probation were unconstitutionally vague, because the evidence did not establish a violation of his probation, because he was given inadequate notice of the violation, and because the trial court's written findings were inadequate. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Edward M. Yarbrough and J. Alex Little (on appeal and at trial) and Mandy Strickland Floyd (on appeal), Nashville, Tennessee, for the Appellant, Glendall D. Verner.

Herbert H. Slatery III, Attorney General and Reporter; Michael A. Meyer, Deputy Attorney General; Glenn Funk, District Attorney General; and Rob Mitchell, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The defendant's convictions stem from his sale of certain securities, including interests in Value Vest, LLC, Circle G Ranch, and Continental Energy Trust, to Norma Caruthers, a retiree. The defendant was indicted in October 2011 for one count of theft of $1,000 or more but less than $10,000; one count of theft of $60,000 or more but less than $250,000, and two counts of securities fraud. All of the alleged offenses were based on transactions that took place between December 2007 and April 2008.

The defendant entered his guilty pleas on March 21, 2013, to the two counts of theft, and the charges alleging securities fraud were dismissed. He was sentenced to two years for the Class D theft and to ten years for the Class B theft, with the sentences running concurrently. The defendant was permitted to serve his entire sentence on probation: six years of supervised probation followed by four years of unsupervised probation. As part of the terms of his probation, he was also assigned to do two hundred hours of community service with Fifty Forward in the Victory Over Crime program. The defendant was to pay $85,000 in restitution to the victim. He was also prohibited from "from selling stocks, bonds, notes, or securities of any kind" and prohibited "from working in the financial services or insurance business."

On April 25, 2014, the defendant's probation supervisor swore the first affidavit which provided the basis for the revocation proceedings, alleging that the defendant violated the terms of his probation when he was terminated from the Victory Over Crime program for noncompliance. The second affidavit, sworn on May 22, 2014, alleged that the defendant engaged in attempts to solicit investors for the Circle G Ranch, violating the special conditions imposed by the court. The affidavit specified the special condition violated as: "Subject is forbidden from working in the financial services industry." The warrant alleged that the defendant had "engaged in attempts to solicit investors for the Circle G Ranch / Elvis Presley Tribute."

2

Due to the unavailability of some of the witnesses, the trial court held the hearing regarding the revocation over three days: on July 10, 2014, on September 11, 2014, and on October 23, 2014. The State presented evidence that the defendant was terminated from his community service program. Carolyn Biggers testified that she was the program director for Victory Over Crime, a free service aimed at helping crime victims and preventing members of the community from becoming victims. The program was part of Fifty Forward, which provided community programming for those over fifty years of age. Ms. Biggers testified that the Victory Over Crime program, which usually does not allow volunteers with criminal records, crafted a special plan for the defendant, who was to create presentations to give to the community telling about his crimes and advising members on how to avoid becoming victims of similar crimes. Ms. Biggers testified that she was "really excited" to have the defendant participate. She first met with the defendant in October 2013, when she explained to him that he would have to complete a training program prior to making actual presentations. The defendant completed twelve community service hours prior to his termination in April 2014, including six out of ten necessary training hours. Ms. Biggers testified that the defendant missed some meetings with her and that he had scheduling conflicts for others. She acknowledged that some of these conflicts were due to his job. Ms. Biggers spoke to the defendant regarding her concerns that they were not meeting often enough. In mid-April, Ms. Biggers had a "frank" discussion with the defendant because she sensed that he was reluctant to participate in the program. The defendant "had concerns about…the family name" and "wasn't comfortable with telling his story." He asked if he could do repairs or landscaping for seniors instead. Ms. Biggers testified that she asked the defendant to write an article for the association's quarterly magazine regarding fraud and that he was willing to write the article but did not want his name associated with it. During training, the defendant seemed focused on an allegation that the victim's daughter had not been honest about some restitution, and Ms. Biggers felt that he would not be effective in the role they had created for him because he did not seem remorseful and was reluctant to have his crimes known. Accordingly, she spoke to her supervisor and they decided to terminate the defendant from the program.

Wesley Holder, the defendant's probation supervisor, testified during the September hearing that he completed the affidavit regarding the community service violation when the defendant was terminated. Mr. Holder stated that, due to scheduling conflicts, the defendant was not able to complete the work Ms. Biggers needed him to complete. When asked if he thought the defendant "made an effort" with the program, Mr. Holder testified, "I don't want to say that, you know, he made it a top priority or anything like that, but, yes, he made an effort." He testified that public service work could usually be transferred to a similar organization in the event of scheduling difficulties but that the defendant's probation specified the Victory Over Crime program, and therefore he could not be transferred to a different organization.

3

Regarding the community service violation, the defendant testified that he was always willing to do what Ms. Biggers had asked and that he was disappointed to be terminated. He testified that Ms. Biggers had suggested that he could attend an event one weekend because he had had conflicts on weekdays. The defendant did not attend the event because he was out of town on that particular weekend and did not think his attendance was mandatory. The defendant felt that Ms. Biggers was "disgruntled" after he missed the event, and even though she assigned him "homework" at their next meeting, she subsequently terminated him from the program. He acknowledged in his testimony that he had expressed reservations to Ms. Biggers, but he stated that he was simply trying to be honest when he expressed concerns about acknowledging his crimes publicly. He averred that he was a "ready and willing" participant of the program.

The State also presented evidence at the hearings that the defendant was involved in the attempted sale of an interest in the Circle G project. Daniel Kingen had known the defendant since 1995, when the two sold health insurance together. Mr. Kingen had borrowed around $15,000 from the defendant in 1998, but Mr. Kingen subsequently declared bankruptcy and defaulted on the debt. Mr. Kingen testified that around 2009, he was the plaintiff in a lawsuit which he expected would result in a large payout. However, he had health problems and ended up borrowing around $200,000 from the defendant for living expenses as the suit progressed. When the lawsuit did not pay what he expected, he was unable to repay the defendant. Mr. Kingen testified that he was contacted by an investigator in spring or summer 2013 and that around the same time, he ran a Google search on the defendant and discovered his criminal history. Mr. Kingen was angry because the defendant had started talking to him about Circle G around 2010 or 2011 and was still "hammering [him] about it" at the time he discovered the defendant's convictions. Mr. Kingen was also angry because the defendant had been contacting Mr. Kingen's friends during the spring and summer of 2013 regarding various investments, particularly Circle G. Mr. Kingen contacted Investigator Trey King and agreed that he would approach the defendant with the idea that he knew someone with money to invest. His understanding of the proposed contract was that the investor would put up $900,000, the investor would receive around $3 million within 120 days, and the defendant and Mr. Kingen would each get one million dollars. He agreed that he had told the defendant that his proceeds would be applied to his prior legitimate debt to the defendant.

Investigator Trey King testified that he had first investigated the defendant in 2004, when the defendant had been targeting the elderly in the sale of promissory notes. The outcome of the investigation was a civil injunction against a company and its officers, prohibiting them from the sale of securities or financial instruments. Investigator King was also involved in the 2011 investigation that led to the defendant's theft convictions. In April 2013, Investigator King received a complaint from a man who

had seen the defendant's guilty pleas in the newspaper and who had given the defendant $20,000 to invest in Mr. Kingen's lawsuit. Investigator King contacted Mr. Kingen, who told him that the defendant was actively selling investments. Investigator King listened to some telephone conversations between Mr. Kingen and the defendant, during which the defendant discussed certain investments. In particular, the defendant mentioned the Circle G investment, which was run by Jerry Hanserd, and the Defender Homes investment, which was run by Ken Brown, who had also been one subject of the 2004 injunction. Investigator King, Mr. Kingen, and Mr. Kingen's counsel came up with the idea to have an investigator pose as an investor and to record the defendant's proposals to the potential investor. Investigator King was questioned about entrapment by the defendant's counsel.

Investigator Roy Copeland posed as a friend of Mr. Kingen's who had $900,000 to invest. Investigator Copeland had two telephone conversations and two face-to-face meetings with the defendant, during which they discussed investment opportunities with Circle G and Value Vest. The Circle G opportunity was presented as an investment in which Investigator Copeland's $900,000 would be given to Circle G for a translation of a documentary featuring Elvis Presley's Kingsmen. The money was to be used to translate the film for buyers who were already in place, and Investigator Copeland was told that he would receive his $900,000 back, with an additional $2.7 million, within 120 days. Investigator Copeland testified that he knew that Mr. Kingen was the defendant's longtime friend, and he acknowledged that Mr. Kingen owed the defendant money and the defendant would have a financial incentive for facilitating the deal. One of the recorded conversations was submitted as an exhibit. In the conversation, the defendant explained the Circle G investment, using the first person plural. In the recording, the defendant also mentioned Defender Homes and a water bottling company in Fiji as potential investments for Investigator Copeland. Two emails sent from the defendant to Mr. Kingen, attaching a contract for Investigator Copeland to review, were introduced as exhibits.

Investigator Copeland testified that one of the recordings indicated that the defendant and Mr. Kingen would share a finders' fee for inducing the investor to give money to Circle G. Mr. Kingen also testified that both he and the defendant would each receive a million dollars and stated that the defendant told him they would split a commission. Investigator King testified that there was a reference in one of the recordings to the defendant receiving a commission.

The defendant acknowledged during the revocation hearing that he had a prior history of misconduct, including a securities fraud conviction in the 1990s and a civil injunction issued in 2004 related to the sale of promissory notes. The defendant confirmed that Mr. Kingen had borrowed $15,000 from him in 1998 and had never repaid

it. He also testified that he advanced Mr. Kingen $265,000 to live on while Mr. Kingen's lawsuit was pending and that, despite Mr. Kingen and his counsel's representations that it was a strong case, Mr. Kingen never realized the money.

Mr. Kingen began to call the defendant in 2013 about Circle G, telling him that if Mr. Kingen received a large commission, he would repay his legitimate debts to the defendant. The defendant testified that he did not approach Mr. Kingen about Circle G. He testified that Mr. Hanserd had previously told Mr. Kingen about Circle G when Mr. Kingen had sought to have Mr. Hanserd promote a record of his. The defendant also denied approaching Mr. Kingen's friends about the opportunity, saying that he had only contacted Mr. Kingen's friends to find out where Mr. Kingen was when they were waiting on the results of the lawsuit. According to the defendant, Mr. Kingen called him in 2013 to say that Investigator Copeland had an annuity maturing, and Mr. Kingen asked if they could participate in Circle G. The defendant also testified that he was not to receive a commission, that the contract specified that only Mr. Kingen would get a commission, and that his expectation was just that Mr. Kingen would repay the money he owed the defendant. He stated that he was merely putting Mr. Kingen and Mr. Hanserd in touch and that none of the money was to go to his companies. He acknowledged, however, that he was working hard to induce Investigator Copeland to invest and that his emails to Mr. Kingen show that he was trying to confirm the deal. He also acknowledged that Mr. Hanserd would "settle up with me compensation, there would have been a finders['] fee." He admitted discussing splitting a finders' fee with Mr. Kingen in one of the recorded conversations and acknowledged that he agreed with Mr. Kingen that they would each get one million dollars. The defendant stated he was at fault for getting involved in the deal but noted that he did not think facilitating it would be a violation of his probation. He acknowledged that Mr. Hanserd's Circle G was the very same investment opportunity which had resulted in his convictions and probation. He also testified that he understood that one of the terms of his probation was not to "be involved in the sale of investments of any kind."

Twice during the course of the hearing, the defense acknowledged that the defendant had violated his probation. Prior to the testimony at the hearings, counsel stated, "We're going to concede the technical violation, but we're going to put on some proof about the extenuating circumstances." At the close of proof, counsel likewise stated, "[Y]es, he technically violated his probation." Counsel argued that the defendant had been induced to take the actions he did because his friend encouraged him and promised the repayment of a debt. The trial court stated that the friendship with Mr. Kingen was some mitigation but that using a confidential informant who was acquainted with the target of an investigation was not unusual. The trial court found that the defendant "violated the terms and conditions of his probation." The court referenced the investment opportunities with Circle G, finding that the defendant was "fully active" in

6

the business, that he was "ready to get back into full-blown business," and that the emails demonstrated his deep involvement with the scheme. The trial court noted that on the reinstatement of probation, the defendant would be required to do general community service work because he might use a program such as Fifty Forward to lure new investors. The trial court ordered the defendant to serve one year in confinement and stated that he would be reinstated to ten years of intensive supervised probation. The defendant appeals.

## ANALYSIS

The defendant's appellate argument is that there was not sufficient evidence to support the finding of a violation. The defendant premises his argument on the fact that his actions do not constitute "work" in the "financial services business," that notice of the forbidden conduct did not comport with due process, that he had no notice of any violation of the condition forbidding selling securities, and that the trial court did not make adequate findings, particularly regarding the violation of the community service provisions of his probation.

Although neither party relies on the fact, we observe that the defendant not only failed to present this argument to the trial court but specifically conceded a "technical violation" of his probation – twice. Instead of establishing that his actions did not constitute "work" or that Circle G was not part of the "financial services" business, the defendant at the hearing was intent on showing that the violation was mitigated by the fact that Mr. Kingen was the defendant's trusted friend who owed the defendant a legitimate debt and by the suggestion that Mr. Kingen had initiated the transaction and that the prosecution had entrapped the defendant, who was only trying to be helpful to a friend.

We review for plain error the defendant's argument that the circumstances of the revocation constitute a denial of due process. For an error to constitute plain error sufficient to merit relief, the following factors must be present: a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is necessary to do substantial justice. *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Additionally, "'the plain error must be of such a great magnitude that it probably changed the outcome'" of the proceeding. *Id.*, 431 S.W.3d at 44 (quoting *Adkisson,* 899 S.W.2d at 642). This court need not consider all the factors if it is clear that the defendant failed to establish at least one. *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010).

7

We conclude that a substantial right of the defendant was not adversely affected and that the defendant has not shown that the issue was not waived for tactical reasons.

The defendant's argument is that the revocation affidavit charged the defendant with having violated a specific condition of his probation and that the term specified was that the defendant was "forbidden from working in the financial services industry." According to the defendant, the Circle G investment may have been a financial transaction, but it was not within the definition of the "financial services" business or industry. Furthermore, he argues that his role in facilitating this one investment cannot be said to constitute "work," because he was not an employee or agent of Circle G and was not compensated. The defendant contends that the trial court was required to strictly construe the terms of the defendant's probation and to interpret ambiguous provisions in his favor. He argues that construing the provision prohibiting him from "working in the financial services … business" to include facilitating the Circle G investment makes the provision unconstitutionally vague.

The defendant further asserts that the State cannot rely on its counter-arguments that the defendant violated a different term of his probation. First, the defendant rejects the argument that he violated the term of his probation prohibiting him from selling "securities of any kind" because this term was not specified in the warrant. Further, the defendant asserts that the State cannot rely on the violation of the community service provisions because the trial court made no specific finding that he violated that provision. Although the defendant also contends that Investigator King's actions violated the purposes of probation, he clarifies in his reply brief that he does not contend that he was entrapped. The defendant classifies his arguments as being based in due process.

A trial court may revoke a sentence of probation if it determines by a preponderance of the evidence that the conditions of probation have been violated. T.C.A. § 40-35-311(e) (2010). The trial court's decision to revoke the defendant's probation is reviewed for abuse of discretion. *State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001); *State v. Harkins*, 811 S.W.2d 79, 82 (Tenn. 1991). Abuse of discretion is found when the appellate court determines that the trial court "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). In *Harkins*, the court noted that reversal of a revocation is only warranted if "the record contains no substantial evidence to support the conclusion of the trial judge that a violation of the conditions of probation has occurred."[1] *Harkins*, 811 S.W.2d at 82. Proof of the violation is adequate

---

[1] However, this court has noted that since the decision in *Harkins*, the Sentencing Act has been amended to specify that the trial court must make its findings by a preponderance of the evidence. *See*

8

when it provides the basis for a "conscientious and intelligent" judgment. *Id.* The trial court's findings of fact and determinations regarding the credibility of witnesses carry the weight of a jury verdict. *State v. Beard*, 189 S.W.3d 730, 735 (Tenn. Crim. App. 2005). Accordingly, the trial court's findings are binding on the appellate court unless the evidence preponderates otherwise. *State v. Lewis*, 917 S.W.2d 251, 257 (Tenn. Crim. App. 1995).

## A. Notice of Prohibited Conduct

The defendant argues that the terms of the probation were so broad that he had no notice of prohibited conduct. Due process requires that the defendant be advised of the relevant term or condition of his probation at the time that the conduct violating that provision takes place. *See State v. Stubblefield,* 953 S.W.2d 223, 225 (Tenn. Crim. App. 1997). As the defendant notes, when the terms of a probation are ambiguous, they must be construed strictly in the defendant's favor – "limiting rather than expanding the meaning of the words." *Lewis*, 917 S.W.2d at 256 (concluding that probation requiring payment of "hospital bills" did not include payment of other medical expenses caused by the defendant's crimes).

However, this court has previously concluded that notice was constitutionally adequate when the defendant had previously engaged in the same conduct and had been penalized by the court for the exact actions that were the basis of revocation. In *State v. Smith*, the defendant had violated a "no contact" provision in his probation prior to the time the probationary period began. *State v. Smith*, 909 S.W.2d 471, 473 (Tenn. Crim. App. 1995). He argued in part that he did not have adequate notice regarding the provision. *Id.* However, this court rejected his due process argument. *Id.* The court noted that he had been advised in open court regarding the provision. *Id.* Moreover, it concluded that "no greater notice" could be given than a prior revocation of his diversion status for violating the same condition. *Id.* The court determined that this notice was sufficient to comply with due process. *Id.* We likewise conclude that the defendant, who was charged with four crimes and pled guilty to two based on his conduct in selling an investment interest in Circle G, was at a minimum on notice that he was subsequently prohibited from selling an investment interest in Circle G, and we hold that this notice of the prohibited conduct was adequate to comport with due process. The condition of probation forbidding the defendant from selling securities of any kind also notified the defendant that he was prohibited from selling an interest in Circle G. Moreover, the defendant, during his testimony, acknowledged that he understood that one of the terms of his probation was not to "be involved in the sale of investments of any kind." We

---

*State v. Farrar*, 355 S.W.3d 582, 586 (Tenn. Crim. App. 2011) (applying the standard but questioning its continued relevance).

9

conclude that notice of the prohibited conduct was, for the purposes of this particular violation, consistent with due process.

## B. Sufficiency of the Evidence and Notice of Violation

The defendant contends that the evidence of the violation was insufficient. In this case, the defendant conceded a "technical violation" of the terms of his probation. The defendant did not specify which term of his probation he violated, but his oral argument focused mainly on the selling of the investment interest to Investigator Copeland. In *State v. Eric William Sanders*, No. E1999-00345-CCA-R3CD, 2001 WL 21689, at *2 (Tenn. Crim. App. Jan. 10, 2001), the defendant had stipulated that he violated his probation by absconding, but he then proceeded to contest the sufficiency of the proof on appeal. This court noted that the State refrained from presenting evidence "[b]ased on this stipulation," and that the defendant "waived his right to require the State to prove by a preponderance of the evidence" that he violated his probation. *Id.* Likewise, in *Practy v. State*, the defendant's guilty plea to a new offense led the court to conclude that sufficient grounds for revocation existed. *Practy v. State*, 525 S.W.2d 677, 682 (Tenn. Crim. App. 1974). In this case, there was no formal stipulation of a violation. However, we have previously relied on the concessions of counsel that a violation took place in upholding a revocation. The defendant's admission of a violation has itself been held to be "substantial evidence" that the violation took place. *State v. Yvonne Burnette*, No. 03C01-9608-CR-00314, 1997 WL 414979, at *2 (Tenn. Crim. App. July 25, 1997); *see State v. Zantuan A. Horton*, No. M2014-02541-CCA-R3-CD, 2015 WL 4536265, at *3 (Tenn. Crim. App. July 28, 2015) (stating that a defendant who admitted violating the terms of his probation conceded an adequate basis for finding of a violation); *State v. Gordon Herman Braden, III*, No. M2014-01402-CCA-R3-CD, 2015 WL 2445994, at *2 (Tenn. Crim. App. May 22, 2015); *State v. Neal Levone Armour*, No. E2003-02907-CCA-R3-CD, 2004 WL 2008168, at *1 (Tenn. Crim. App. Sept. 9, 2004) ("Essentially, then, the defendant conceded an adequate basis for a finding that he had violated the terms of probation.").

In *State v. Ricky Davis*, No. 03C01-9706-CC-00215, 1998 WL 205925, at *1 (Tenn. Crim. App. Apr. 29, 1998), the defendant's trial counsel conceded that certain felony convictions were a violation of his probation. This court concluded, however, that the trial court incorrectly relied on those convictions because they were not referenced in the warrant and there was accordingly no notice as required under *Gagnon v. Scarpelli,* 411 U.S. 778, 786 (1973). *Ricky Davis*, 1998 WL 205925, at *2. Because counsel also conceded two misdemeanor offenses which were alleged in the warrant, the appellate court upheld the revocation. *Id.*

10

In this case, the defendant likewise conceded a violation of his probation, in particular his sale of the investment interest in Circle G, but the violation of the term forbidding the defendant from "selling … securities of any kind" was not specified in the warrant. We accordingly consider whether he had constitutionally adequate notice that the revocation would be based upon the selling of securities. *See State v. Christopher Lynch*, No. E2001-00197-CCA-R3-CD, 2002 WL 554462, at *3 (Tenn. Crim. App. Apr. 16, 2002) (holding that counsel's concession of a violation not charged in the warrant was a proper basis of revocation when there was adequate notice).

Because the guilt of a probationer has already been decided, "'the full panoply of rights due a defendant'" does not apply to a revocation hearing. *State v. Wade*, 863 S.W.2d 406, 408 (Tenn. 1993) (quoting *Black v. Romano*, 471 U.S. 606, 613 (1985)). However, a probationer's freedom from incarceration being at stake, certain due process rights do apply. *Wade*, 863 S.W.2d at 408. The minimum requirements of due process include:

> (a) written notice of the claimed violations of (probation or) parole; (b) disclosure to the (probationer or) parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking (probation or) parole.

*Practy*, 525 S.W.2d at 680 (quoting *Gagnon,* 411 U.S. at 786 (quoting *Morrissey v. Brewer,* 408 U.S. at 489 (1972))); *see Bentley v. State*, 938 S.W.2d 706, 714 (Tenn. Crim. App. 1996) (concluding that it was error to deny probationer notice of violation and a hearing) *superseded by rule as stated in State v. West*, 19 S.W.3d 753, 756 n.9 (Tenn. 2000).

Generally, "[t]he revocation of probation based on grounds not alleged and noticed to the defendant is a violation of due process." *State v. Chad Allen Conyers*, No. E2004-00360-CCA-R3-CD, 2005 WL 551940, at *4 (Tenn. Crim. App. Mar. 9, 2005) (reversing revocation based not on violation of "peeping tom" statute as alleged in warrant but on the defendant's presence in a department store bathroom "for the purpose of some kind of sexual activity," an action which was not prohibited by the terms of his probation). In *State v. David L. Baker*, No. M2009-01651-CCA-R3-CD, 2010 WL 2943113, at *4

11

(Tenn. Crim. App. July 26, 2010), the defendant was charged with violating his probation by committing a new offense and by failing to attend sex offender treatment classes, but the trial court revoked his probation based on the testimony of his own witness that he refused a search of his premises. This court reversed the revocation, finding the notice of the violation constitutionally inadequate. *Id.* at *5.

However, this court has held that written notice of a violation is not necessary when the defendant had actual notice of the violation on which the trial court relied. In *State v. Peck*, 719 S.W.2d 553, 556 (Tenn. Crim. App. 1986), the trial court revoked the defendant's probation on its own motion without a hearing. On a motion to reconsider, the trial court conceded it had erred and granted a rehearing, during which it again revoked probation. *Id.* at 557. This court held that the trial court had erred in its initial judgment but that the initial judgment gave the defendant actual notice of the alleged violations even though there was never written notice, and the revocation granted at the rehearing was upheld. *Id.* Likewise, in *Stamps v. State*, this court upheld a revocation even absent written notice when the defendant was advised at one hearing that her conduct was a violation of probation and the hearing was continued for several months to allow her an opportunity to cease the conduct. *Stamps v. State*, 614 S.W.2d 71, 73-74 (Tenn. Crim. App. 1980). Other cases have held that actual notice of the alleged violation is sufficient for due process. *State v. Bobby Wells, Jr.*, No. E2000-01496-CCA-R3-CD, 2001 WL 725305, at *8 (Tenn. Crim. App. June 28, 2001) (finding adequate notice when the petition cited only a failure to report but the court had previously informed the defendant that it intended to rely on new convictions in considering revocation); *State v. James C. Wolford*, No. 03C01-9708-CR-00319, 1999 WL 76447, at *6-7 (Tenn. Crim. App. Feb. 18, 1999) (concluding that the trial court's action in orally informing the defendant of the reasons for the revocation proceeding prior to the hearing provided adequate notice); *State v. Clifford W. Jackson*, No. 02C01-9802-CR-00041, 1999 WL 615742, at *4 (Tenn. Crim. App. Aug. 13, 1999) (concluding that due process was satisfied where the record showed an absence of a warrant but also demonstrated that the defendant was aware that a hearing had been scheduled and that the subject would be the alleged violations). Due process is flexible and "calls for such procedural protections as the particular situation demands." *Stamps*, 614 S.W.2d at 73 (quoting *Morrissey*, 408 U.S. at 481).

We conclude that the defendant had actual notice that the trial court would be considering the particular term involved in the violation and that this notice was sufficient to comport with due process. In describing the conduct at issue, the warrant itself alleged that the defendant had "engaged in attempts to solicit investors for the Circle G Ranch / Elvis Presley Tribute." Furthermore, when the defendant's probation supervisor testified, the prosecution asked whether the second warrant was related to the violation of a term of his probation, specifically, the term prohibiting "selling investment

12

products of some sort." This occurred at the second hearing, approximately one month before the final hearing at which the defendant himself testified. We conclude that although the warrant specified a violation of the term that the defendant was not to "work" in the "financial services industry," the defendant was on actual notice, at least by the second hearing, that the violation instead concerned "selling investment products." The defendant on two occasions conceded this violation. "[W]e conclude that the appellant was not prejudiced, misled, or surprised by the court's failure to issue written notice." *James C. Wolford*, 1999 WL 76447, at *7. We determine that the lack of written notice did not violate the defendant's due process rights. *See Christopher Lynch*, 2002 WL 554462, at *3-5 (concluding that the defendant had actual though not written notice of the violation which his counsel conceded, and that this concession was a sufficient basis for revocation).

## C. Written Order

The record does not contain a written order, only the minutes of the court determining that "upon the evidence introduced and due consideration, said warrant is by the court sustained." Generally, the trial court's failure to enter a written order detailing the reasons for the revocation is error. *State v. Conner*, 919 S.W.2d 48, 49 n.3 (Tenn. Crim. App. 1995). The defendant is entitled to "a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." *State v. Leiderman*, 86 S.W.3d 584, 590 (Tenn. Crim. App. 2002) (quoting *Morrissey*, 408 U.S. at 489). However, the trial court's failure to make specific written findings related to a probation revocation does not necessarily warrant reversal, because when "the transcript demonstrates the trial court provided adequate findings at the conclusion of the probation revocation hearing showing both the grounds for the revocation and reasons for the court's findings, the due process requirement of a 'written statement' is satisfied." *Leiderman*, 86 S.W.3d at 591. Although this court has held that a general finding that the defendant "violated the conditions of his probation" is not adequate and "a more specific enumeration" is "preferable," we have also held such a deficiency harmless where the court also made a more specific finding, for instance, that the defendant violated the laws of the state. *See, e.g.*, *State v. Norman B. Thompson*, No. E2000-01017-CCA-R3-PC, 2001 WL 298633, at *2 (Tenn. Crim. App. Mar. 28, 2001) (citing cases).

We agree with the defendant that the trial court's statements during the hearing were not adequate to support the conclusion that he violated the term of his probation requiring him to perform community service with Fifty Forward. While the trial court noted that it would reassign the defendant to general community service to avoid the danger of him preying on retirees through Fifty Forward, it made no specific finding that the defendant had been terminated from the program or that the termination was due to his lack of cooperation. The trial court did, however, make oral findings regarding the

13

sale of an investment interest in Circle G.  We note that it is hardly surprising that the trial court's findings were, in the defendant's words, "anemic," given the defendant's concession on two separate occasions that he had committed a "technical violation" of the terms of his probation. The trial court, in finding that the defendant violated the terms of his probation, determined that he "was fully active" in the sale of the investments and that his emails indicated he was "ready to get back into full-blown business."  The trial court also noted that the project involved Circle G, "the very one that he's on probation for to begin with."  While the trial court's findings would have benefited from an increased specificity, we conclude that these findings, given the defendant's concessions, are adequate to satisfy due process.


## CONCLUSION


We hold that the trial court did not abuse its discretion in revoking the defendant's probation and that the defendant's due process rights were not violated.  Accordingly, we affirm the judgment of the trial court.


_____

JOHN EVERETT WILLIAMS, JUDGE

14